Harriet Lois JONES, Plaintiff,

v.

JOHN HANCOCK MUTUAL LIFE IN-
SURANCE COMPANY, a Massachu-
setts corporation, Defendant.

Civ. A. No. 5371.

United States District Court
W. D. Michigan, S. D.

Aug. 23, 1968.

Hillman, Baxter & Hammond, Grand Rapids, Mich., for plaintiff. Douglas W. Hillman, Grand Rapids, Mich., of counsel.

Wheeler, Upham, Bryant & Uhl, Grand Rapids, Mich., for defendant. Gordon B. Wheeler, Grand Rapids, Mich., of counsel.

## OPINION

FOX, District Judge.

On June 27, 1966, plaintiff, Harriet Lois Jones, commenced this action against defendant, John Hancock Mutual Life Insurance Company, to recover the proceeds of a life insurance contract entered into by herself, her husband, R. Edsel Jones, and defendant on or about December 30, 1965.

In May of 1968, a jury returned a verdict in favor of plaintiff. During the trial this court decided various legal issues which we believe merit further discussion and analysis.

The facts can be briefly summarized as follows:

Raymond Edsel Jones and Hugh W. Crouse, an agent of the John Hancock Mutual Life Insurance Company, met in 1963 while Mr. Jones, who lived in Grand Rapids, Michigan, was in Ohio on business.

Mr. Crouse operates under the name of "Crouse, Long and Associates" in Mansfield, Ohio, as a special agent of the William B. Hoyer Agency, of Colum-

bus, Ohio. He is licensed to sell life insurance in both Ohio and California.

The Hoyer Agency is one of the oldest, most respected and successful John Hancock agencies in the country.

Mr. Crouse is an experienced life insurance salesman, having sold over a million dollars of insurance per year for most of the years he has been with the John Hancock Company.

After they became acquainted, Mr. Crouse and Mr. Jones periodically discussed Mr. Jones' life insurance needs. Mr. Jones purchased a policy of life insurance from Mr. Crouse some time during 1964, which was written by Mr. Crouse for the Franklin Life Insurance Company.

Mr. Crouse continued to discuss Mr. Jones' insurance requirements when they would see each other in Mansfield and elsewhere. Both were private airplane pilots and did a substantial amount of traveling.

Finally, in December, 1965, Mr. Crouse persuaded Mr. Jones to purchase additional life insurance from John Hancock Mutual Life Insurance Company. The type of policy or policies, and the total amount, within limits, was left up to Mr. Crouse.

Mr. Crouse concluded that an ordinary life policy (called a Signature 25) with a face value of $43,000, and an additional $43,000 in the event of accidental death, with provisions for an additional $860 per month payments for a decreasing term of twenty years, would be a proper policy for Mr. Jones.

The application for the insurance was prepared by Mr. Crouse in Mansfield. It designated Mrs. Jones as the owner and primary beneficiary, and Mr. Jones as the insured.

After the application was completed, Mr. Crouse arranged for Mr. Jones to be examined in Mansfield on December 8, 1965, by two doctors who worked regularly for the John Hancock Company.

Both examinations revealed that Mr. Jones was a normal, healthy man.

Subsequently, at the invitation of Mr. Crouse, who had certain business interests in Los Angeles, Mr. and Mrs. Jones and their children flew to Los Angeles to spend the 1965 Christmas Holidays with him and his wife.

Mrs. Jones and their daughter went by commercial flight, while Mr. Jones and their three sons flew in his own plane as far as Texas. After being grounded there by foul weather, they proceeded to California via commercial airline.

While in California, the Joneses and Mr. Crouse met on approximately December 30, 1965, and completed the insurance application. Because Mr. Jones was a licensed pilot, a supplemental aviation application was required.

The supplemental aviation application dealt with the number of hours flown, both in total and by year, by Mr. Jones. Under the circumstances this information had to be estimated as Mr. Jones' log books in which actual hours were recorded were in his plane in Texas.

Nevertheless, Mr. Crouse decided to proceed on the basis of Mr. Jones' estimates and completed the application. Mr. Crouse explained to the Joneses that because of his flying hours, he might be charged an added premium of $2.50 per thousand. It is undisputed that Mr. Jones said that he would accept the policy with the added premium.

In order to complete the transaction, Mr. Crouse asked the Joneses to sign the application. This was done on the bottom of the application form, Part A. To satisfy defendant's regulation that the first month's premium be submitted with the application for insurance, Mr. Crouse persuaded the Joneses to sign in blank two cognovit notes and an assignment of the policy, which forms were supplied to Crouse by the Hoyer Agency. Mr. Jones was willing to write a check for the amount of the premium; however, Mr. Crouse told him that a note

would be better than a check, since the exact premium could be accurately computed by the Hoyer Agency and the note then completed by them.

Below the signatures of the Joneses on Part A of the application form, a conditional receipt was attached. It read as follows:

NOTICE: APPLICABILITY OF THIS CONDITIONAL RECEIPT IS
GOVERNED BY AGREEMENT B OF APPLICATION

### CONDITIONAL RECEIPT FOR ADVANCE PAYMENT WITH APPLICATION FOR NEW INSURANCE

RECEIVED from _____ the sum of $_____ paid with application to the John Hancock Mutual Life Insurance Company bearing the same date and number as this Receipt. If this sum is at least one month's proportionate part of the premium according to the Company's published rates for the policy and premium interval selected in the application, and if the Company at its Home Office shall determine that each person proposed for insurance, including the proposed Insured, was, on the date of completion of the latest of all required Parts A and B and medical examinations pertaining to each such person, acceptable under the Company's rules for the premium class, amount and plan of insurance, and additional benefits, if any, applied for, the contract applied for shall take effect retroactively as of the date of the latest of all required parts of the application and medical examinations, or of such other date as may be requested in the application and accepted by the Company, notwithstanding any change in acceptability due to any disease contracted or injury sustained after the date of completion of all required parts of the application and medical examinations.

If said contract takes effect hereunder, any balance of the said premium may be paid while all persons proposed for insurance are living, and within 60 days hereafter. If the balance is not so paid, the contract shall continue only for such proportionate part of said premium interval as the amount paid under this Conditional Receipt bears to said premium.

The application shall be deemed to have been declined if it has not been approved by the Company within 60 days hereafter and the amount paid shall be returned upon surrender of this receipt. Any check tendered is received subject to collection only.

|  |  |
|---|---|
| Name of proposed Insured _____ Date _____ 19___ | John Hancock Mutual Life Insurance Company By _____ Agent |
| Form 156–CR–63 | |

———————◆———————

Just above this "Conditional Receipt" the following appeared: "Receipt must not be detached unless Item 17 indicates payment has been made." Item 17 states: "What advance payment is made with this Part A? (If none, so state.) (See agreement B.)"

This conditional receipt was left blank in order to permit the Hoyer Agency to fill in the exact figures. Mr. Crouse then retained the receipt so that the amount of the premium could be inserted when it was finally determined.

After completing the transaction, Mr. Jones asked Mr. Crouse, "Am I covered?"—to which Mr. Crouse replied, "Yes, you are now technically covered."

Mr. Crouse then sent the application and other documents, including one of the cognovit notes which he had endorsed, to the Hoyer Agency in Columbus. After Mrs. Pursley of the Hoyer Agency New Business Department computed the premium and inserted the figure $1,134.45 in Box 17 of the application, the application was sent to the defendant in Boston. The conditional receipt was detached and retained in the Hoyer Agency file. Mrs. Pursley also inserted the sum of $1,134.45 on one of the cognovit notes which had been

signed in blank by the Joneses and endorsed by Hugh W. Crouse.

The Joneses left California in January, 1966. Mrs. Jones and the children flew by commercial flight, and Mr. Jones, after returning to Texas by commercial flight, proceeded to Michigan in his own plane. He was killed when his plane crashed as it approached the Kent County Airport near Grand Rapids.

Defendant conducted a thorough investigation following Mr. Jones' death. On March 15, 1966, defendant concluded that no policy should issue because (1) no advance payment of the first premium had been made; (2) the conditional receipt was not dated or completed; (3) no chest X-ray or electrocardiogram had been conducted; and (4) Mr. Jones' estimates of his flying hours on his supplemental aviation application were inconsistent with the hours reported in his log books.

We treat these issues in the order set forth above.

### I. *Advance Payment.*

The John Hancock Company is an expert in its field. Its varied and complex instruments and contract clauses are prepared by it alone. Because a layman is unversed in insurance provisions and practices, he may properly and justifiably place heavy reliance on the knowledge and good faith of the company, its representatives and agents.

■ The company and its representatives and agents, in turn, are under correspondingly heavy responsibility to him. His reasonable expectations in his dealings with an insurance company and its agents may not be frustrated. Members of the public may not be subjected to technical encumbrances and hidden pitfalls. Insurance documents must be construed liberally to allow coverage to the full extent that fair interpretations will allow. Allen v. Metropolitan Life Ins. Co., 44 N.J. 294, 208 A.2d 638, 644 (1965).

While binders and insurance policies are contractual in nature, they are not ordinary contracts, but are what is known in the law as "contracts of adhesion" between parties not equally situated. Gerhardt v. Continental Insurance Co., 48 N.J. 291, 225 A.2d 328 (1966).

As Judge Learned Hand said:

"A man must read what he signs, and he is charged if he does not; but insurers who seek to impose upon words of common speech an *esoteric significance intelligible only to their craft*, [the insurance and underwriting industry] *must bear the burden of any resulting confusion.*" Gaunt v. John Hancock Mut. Life Ins. Co., 160 F.2d 599, 602 (2 Cir. 1947). (Emphasis supplied.)

Life insurance companies, including defendant in this case, have persisted in word and deed in a course of ambiguous conduct because it is profitable for them to do so.[1] John Hancock itself has been

1. In discussing the use by life insurance companies of "non-binding binders," the New Jersey Court in Allen v. Metropolitan Life Ins. Co., supra, said:

Much of the difficulty may be laid at the doorstep of the life insurance industry itself for, despite repeated cautions from the courts, it has persisted in using language which is obscure to the layman and in tolerating agency practices which are calculated to lead the layman to believe that he has coverage beyond that which may be called for by a literal reading. The reports are replete with instances where company agents, as here, obtained payment of the full annual premium in ad-

vance on the broad representation that there would be interim coverage pending the company's investigation of the application and its action thereon. See, e. g., Wood v. Metropolitan Life Insurance Company, 193 F.Supp. 371, 372 (N.D.Cal.1961), aff'd per curiam, 302 F.2d 802 (9 Cir. 1962); cf. Cheek v. Pilot Life Ins. Co., 215 N.C. 36, 1 S.E.2d 115, 116–117 (1939); Simpson v. Prudential Insurance Co. of America, supra, [227 Md. 393,] 177 A.2d 417, at p. 419; 44 Yale L.J., supra, at p. 1231; 63 Yale L.J., supra, at p. 533; 60 Harv.L. Rev. 1164, 1165 (1947). Indeed, the very acceptance of the premium in advance tends naturally towards the un-

before the courts previously in cases arising out of the use of this ambiguous binder. In each case the ambiguity has properly been resolved against the life insurance company. *See* Gaunt v. John Hancock Mutual Life Ins. Co., supra, and Duncan v. John Hancock Mutual Life Ins. Co., 137 Ohio St. 441, 31 N.E. 2d 88 (1940).

■ The term "advance payment" should be given its fair, reasonable, normal and apparent meaning, in light of all the other provisions in the application.

Since the defendant selected the term it should be strictly construed against it.

■ As used in the application, the term "advance payment" is ambiguous. It does not specify the manner or method of payment or prescribe that payment be only by cash or check.

■ A cognovit note is not an ordinary note. It is indeed an extraordinary note which authorizes an attorney to confess judgment against the person or persons signing it. It is written authority of a debtor and a direction by him for the entry of a judgment against him if the obligation set forth in the note is not paid when due. Such a judgment may be taken by any person or any company holding the note, and it cuts off every defense which the maker of the note may otherwise have. It likewise cuts off all rights of appeal from any judgment taken on it.

Mr. Crouse persuaded the Joneses to sign the note when they were all aware that Mr. Jones could have written a check. Mr. Crouse did this not with any intention of misleading or defrauding the Joneses, but because, as he testified, this was the normal procedure he and the Hoyer Agency followed.

One of the most impressive aspects of the issue of whether the cognovit note for $1,134.45 constituted a valid advance payment is the fact that defendant knew, before this law suit was commenced, that, in the course of the Hoyer Agency's business, it was a common practice to accept this type of advance payment.

In a letter of February 11, 1966, from Mr. Adomat, Home Office Inspector to the Department of Special Activities of defendant, Mr. Adomat said:

"Mrs. Hoyer stated that the cognovit note December 18, 1965 in the amount of $1,134.45, payable to the writing agent, Mr. Crouse, is being held in their file. *It is a routine procedure of this office to accept this type of note to pay initial premium on a policy; that much of their business is written on this basis.*" (Emphasis supplied.)

In another letter of March 5, 1966, to the defendant's Special Activities Department, Mr. Adomat said:

"*Mr. William Hoyer stated that it has been a common practice for many years through their agency to accept a cognovit note for the initial annual premium upon completion of an application.* During the processing of the application, this note is held by the agency in a casual file. *At the time of application, and if the applicant requests it, a conditional receipt is given.* It is also their procedure to make a photostatic copy of the note and give this to the applicant in lieu of a receipt. *The cognovit note is made payable to the writing agent or the*

derstanding of immediate coverage though it be temporary and terminable; any collateral advantage other than interim coverage is insubstantial and is not what the lay applicant is generally seeking by his advance payment. 208 A.2d at 642.

The court then said at 644:

When the company's representatives solicited Allen they could readily have taken his application without any advance premium. For reasons important to the company and to its financial advantage, they sought and obtained the annual premium in advance on the assertion that their receipt would afford immediate coverage. There can hardly be any question as to Allen's reasonable expectations in the circumstances.

*agency.* When the policy is issued, the note is submitted to their bank, who in turn issue a check in the name of the writing agent or the agency, and for the amount indicated on the note. *This money is then credited to the agency account in the usual manner.* The insured repays the moneys involved on a monthly basis to the agent or agency, and in turn is repaid to the bank with interest. The money is repaid by the insured within a maximum time limit of ten months, but usually sooner." (Emphasis supplied.)

In Couch on Insurance 2d, § 9.37, at 405–406, it is said:

"Although agents are forbidden to take notes for initial premiums, the taking of a note will constitute a payment of the premium where the custom is for the agent to take the note in his own name and charge it to himself in his account with the company, being responsible for its collection."

The defendant has a bank account in Columbus, Ohio, in which the William B. Hoyer Agency deposits monies held by it in behalf of the defendant. This is in accordance with Paragraph 19 of the agency contract between the Hoyer Agency and the defendant.

19. He shall be responsible to the Company for all monies received on its account by him or his employees, or by agents appointed by him, and shall hold such monies in trust for the Company. He shall deposit all such monies, properly segregated from all other funds, in an account in the Company's name in a bank approved in writing by the Company. At such time as the Company may require, but not less frequently than once a week, he shall remit to it all such monies not previously remitted, from which he may deduct his commissions or collection fees herein specified, to the extent that said deduction does not leave any amount due from him to the Company. The Company may at any time and from time to time, by notice in writing, require the General Agent to deposit or remit any specified part or parts or the whole of such monies without any deductions whatever and thereafter remittances shall be in compliance with such written notice or notices.

From this and from the March 5th letter to the Special Activities Department, it is clear that defendant looks to this bank account for the payment of premiums and not to any payment submitted with the application. It is also clear that the defendant draws on its Columbus bank account to cover advance payments and that the William B. Hoyer Agency would not send in a prepaid application unless the Hoyer Agency had deposited to the John Hancock Company's bank account sufficient funds to cover all such prepaid applications.

■ Thus, the jury could properly have concluded that the John Hancock Company looked to the Hoyer Agency for the payment of premiums on all prepaid applications. The jury properly found that the Jones application, which contained the figure of $1,134.45 in the box which indicated advance payment, was a prepaid application. In Conservative Life Ins. Co. v. Condos, 24 Ohio App. 504, 157 N.E. 306, 307–308 (1927), the court said:

"Upon the question of law whether or not the taking of a note constitutes a payment, it is well settled by the weight of authority that an agent of a life company, who is intrusted with the business of closing the contract by delivering the policy, has an implied authority to determine how the premium then due shall be paid, whether in cash, or, as is sometimes done, by giving credit, *in which case the agent becomes the creditor of the insured, and the debtor of the insurer.* In that event, though the agent should subsequently default, and the premium should never reach the company, the policy would still be binding." Mutual Life Ins. Co. v. Logan (9 Cir.) 87 F. 637. (Emphasis supplied.)

Defendant asserts that it cannot be held to have accepted the ten-month cognovit note as an advance payment or waived any provision in its application, unless it acted with full knowledge of all of the material facts. An insurance company such as John Hancock acts only through its agents.

Mrs. Pursley inserted ten months in the cognovit note. She is a managing agent of John Hancock's general agent, William B. Hoyer Agency. The Joneses did not fill out any part of the cognovit note or the application except to sign their names.

Both the William B. Hoyer Agency, of Columbus, Ohio, and Mr. Hugh W. Crouse, of Mansfield, Ohio, were agents of John Hancock Mutual Life Insurance Company, and neither of them was an agent of Mr. or Mrs. Jones.

Ohio Rev.Code § 3911.22 provides:

"Any person who solicits an application for insurance upon the life of another person shall, in any controversy between the insured or his beneficiary and the company issuing a policy upon such application, be considered the agent of the company and not the agent of the insured."

Defendant claims that the agency contract between the John Hancock Company and the Hoyer Agency prohibited the use of a cognovit note, such as the ones executed by Mr. and Mrs. Jones, as payment of the initial premium for a life insurance policy, and also that the Special Agents Contract between the Hoyer Agency and Mr. Crouse contained the same limitation.

There was no evidence that such a limitation upon John Hancock's agents was ever disclosed to the Joneses.

Irrespective of any limitations in such contracts, agents of the defendant, such as Mr. Crouse, may have apparent authority to accept such a note as payment of the initial premium. This is supported by the nature of the bank account which the agent maintains for the defendant and by the fact that, in spite of the claimed limitation, it was the ordi-nary practice and custom of the agent to accept cognovit notes in prepayment of premiums.

Mr. and Mrs. Jones could have reasonably concluded from the remarks made by Mr. Crouse to Mr. Jones concerning the cognovit note and from the use of the blank notes and assignment forms of the Hoyer Agency by Mr. Crouse, that Mr. Crouse had apparent authority to accept the cognovit note as an advance premium payment. Pannunzio v. Monumental Life Ins. Co., 168 Ohio St. 95, 151 N.E.2d 545 (1958).

■ Ohio law is controlling in this case. Under the law of Ohio, knowledge incident to an insurance risk acquired by an agent of the insurer, who is authorized to solicit and make out applications for insurance policies, submit them to his principal, deliver policies when issued, and collect advance premiums or collect premiums thereon, is imputable to his principal, and, in the absence of proof that the applicant for insurance knew, or should have known, that the insurer was being deceived, the insurer is estopped from disclaiming liability on a temporary insurance coverage contract by showing that its agent failed or neglected to disclose such information to it.

Insurers are in a business. The business is carried on with agents of their own selection. If an agent acts within his actual or apparent scope of authority, or, in the performance of his work, engages in a breach of trust which misleads both the applicant for insurance and the insurer, it is only just that the insurer should bear the consequences of the agent's conduct rather than the applicant who is seeking insurance protection and expending his money therefor, and who has the right to rely upon the honesty and fair-dealing of the agent.

■ The Ohio courts apply the principle of waiver and estoppel in a liberal manner to insurance contracts, whether temporary contracts of insurance coverage or permanent policies, to enforce good faith and prevent injustice and

fraud where the insured has been misled by the acts of the insurer and its agents. Pannunzio v. Monumental Life Ins. Co., supra.

Thus, advance payment may mean any reasonable equivalent, such as a check, money order or cognovit note.

■ We hold that in light of all of the facts in this case the cognovit note for $1,134.45 signed by Mr. and Mrs. Jones was an advance payment.

II. *Completion of Conditional Receipt.*

Defendant asserts the failure of the Joneses to complete the conditional receipt as a ground for denying coverage.

■ Mr. and Mrs. Jones were entitled to accept and rely upon the advice, guidance or counsel of Mr. Crouse as to the appropriate manner of completing the application for insurance and the supplemental aviation application to the extent that a reasonably prudent person under the same or similar circumstances would have relied upon such advice, guidance or counsel.

■ The conditional receipt was not filled in or physically delivered to Mr. and Mrs. Jones because Mr. Crouse intended to retain it for their convenience. He testified that by retaining it he avoided problems which might arise if a receipt were lost or mislaid by an applicant. Furthermore, it was not possible to determine the exact amount of the premium at that time. This is the reason Mr. Crouse told Mr. Jones not to write a check but to sign the cognovit notes instead.

An applicant advised by a life insurance agent to in effect leave the details to him, to trust in him, cannot be faulted for doing exactly what the defendant through its agent encouraged him to do. Fortin v. New York Life Ins. Co., 185 Minn. 523, 241 N.W. 673 (1932); New York Life Ins. Co. v. Abromietes, 254 Mich. 622, 236 N.W. 769 (1931).

We hold that the directions on the application regarding the completion of the conditional receipt were substantially complied with.

III. *Chest X-ray and Electrocardiogram.*

Defendant contends that Mr. Jones was not insurable at the date of the application because he did not have a chest X-ray and an electrocardiogram.

Under John Hancock's own rules a chest X-ray and/or an electrocardiogram is not required if the life insurance in force on the life of the applicant at the time of the application, plus the amount of insurance applied for, is less than $300,000. It was clearly established that the total life insurance coverage on Mr. Jones on December 30, 1965, including the instant policy, was less than $300,000.[2] As a matter of fact there was no reason under the company rules for Mr. Jones to have had an electrocardiogram or chest X-ray.

■ Further, it was Mr. Crouse's responsibility to arrange for the sort of physical examination desired. Therefore, his failure to request a chest X-ray and electrocardiogram cannot be used by defendant to defeat temporary insurance coverage under the conditional receipt, and the John Hancock Company may not

---

2. The insurance policy which was the subject of this application had a value of $172,000. The other policies in effect were $16,000, 1956, ordinary life with Federal Life and Casualty Co.; $50,000, 1960, decreasing term with Prudential Insurance Co. of America; and $100,000, 1962, decreasing term with Franklin Life Ins. Co.

Decreasing term insurance is known in the trade and it alerts an actuary to the fact that the face amount of the policy must be reduced to its value at the present time. From the application form in this case an actuary would know that the insurance policies designated as decreasing term would have to be reduced to their value as of the date of the application. The total value of these other policies, reduced to their value at the time of this application, was $97,233.50. This amount added to the $172,000 value of the insurance policy in the instant application, gave a total insurance coverage of $269,233.50, considerably less than the $300,000 cut-off figure for requiring a chest X-ray and electrocardiogram.

now claim that the physical examinations are not complete, or that the lack of these two items from the examination records precludes Mr. Jones' insurability. Gettins v. United States Life Ins. Co., 221 F.2d 782 (6th Cir., 1955).

In addition, there was no evidence that Mr. Jones knew or was advised that there should be either an electrocardiogram or a chest X-ray in connection with his examinations. Therefore, the plaintiff cannot be bound by any rules of the company in this respect since it was the responsibility of the company, through its agents, to arrange for such examinations as it desired, and to make such requirements known to an applicant.

The failure of the John Hancock Company or its agents to do this may not be used to defeat the plaintiff's claim in this case. Allen v. Metropolitan Life Ins. Co., supra.

IV. *Supplemental Aviation Application.*

Defendant claims that Mr. Jones made material misrepresentations with respect to the total number of hours he had flown and to the total number of hours he had flown in each of the three years preceding his death, and that this bars the right of the plaintiff in this case to recover.

It was admitted by Mrs. Jones that the hours filled in on the supplemental aviation application did not correspond with the figures shown by Mr. Jones' log books.

As both Mr. Crouse and Mr. Jones were aware at the time the supplemental aviation application was completed, Mr. Jones was estimating his hours.

Mr. Adomat, in his letter of March 5, 1966, to the defendant's Special Activities Department, stated:

"In connection with the completion of the supplemental aviation application, Mr. Crouse stated that he certainly knew the extent of Mr. Jones' flying activities. This had been discussed with Mr. and Mrs. Jones in Los Angeles at the time of completing the aviation application. Mr. Jones had left his plane in Amarillo, Texas, and his log book was in the aircraft. The hours shown in the approximate columns on the supplemental application completed were an estimate made by Mr. Jones as to the number of hours flown in the various categories indicated. Mr. Crouse had quoted a standard rate of premiums to Mr. and Mrs. Jones. However, he had informed them of the possibility of a rating because of Mr. Jones' flying activities; that he had submitted the supplemental aviation application to the Home Office for a determination. He would then later inform them of the Company's decision. Mr. and Mrs. Jones agreed that if it was the Company's decision that a rating would be required, this would be acceptable to them."

Mr. Jones did not intend to attempt to willfully or fraudulently understate his flying hours. If a policy had been issued based on his estimates it is clear under Ohio law that the defendant would not be able to deny coverage on this ground.

Ohio Revised Code § 3911.06 provides:

"No answer to any interrogatory made by an applicant in his application for a policy shall bar the right to recover upon any policy issued thereon, or be used as evidence at any trial to recover upon such policy, *unless it is clearly proved that such answer is wilfully false, that it was fraudulently made,* that it is material and that it induced the company to issue the policy, that but for such answer the policy would not have been issued and that the agent or company had no knowledge of the falsity or fraud of such answer." (Emphasis furnished.)

We see no reason why a stricter test should be applied where an applicant agrees to pay a higher premium if the company determines it is necessary.

Under such circumstances the discrepancy with respect to Mr. Jones' flying hours was immaterial and is not a de-

fense to this action. Pannunzio v. Monumental Life Ins. Co., supra.[3]

In light of the foregoing, it is clear to this court that the decision of the jury was correct and should not be disturbed.

---

**3.** Even if it were determined that the greater premium rate should have been applied, John Hancock cannot complain that an insufficient amount was paid. The company's rules for advance payments require only a one month premium to make the policy effective. In this case the Joneses intended to pay an annual premium, so even if that amount was insufficient to cover an entire year, it was considerably in excess of the required monthly premium.