854 F.2d 1316
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Adrian S. DIAMOND, Plaintiff-Appellee,
v.
METROPOLITAN LIFE INSURANCE COMPANY, Defendant-Appellant.
 No. 87-1700.
 United States Court of Appeals, Fourth Circuit.
 Argued May 3, 1988.
Decided Aug. 8, 1988.
 
 Rena Friedlander (William J. Toppeta on brief) for appellant.
 Glenn E. Bushel (Matthew W. Nayden, Melnicove, Kaufman, Weiner, Smouse & Garbis, P.A. on brief) for appellee.
 Before HARRISON L. WINTER, Chief Judge, and MURNAGHAN and SPROUSE, Circuit Judges.
 PER CURIAM:
 
 
 1
 Adrian S. Diamond, the plaintiff, instituted this action in the Circuit Court for the Baltimore City against Metropolitan Life Insurance Company, seeking payment on her husband's universal life insurance policy. Metropolitan caused the action to be removed to the United States District Court for the District Court of Maryland (Alexander Harvey, II, C.J.) on the basis of diversity.[1] Both parties filed Motions for Summary Judgment. After an oral argument, the district court granted the plaintiff's motion and denied the defendant's motion. Judgment was entered in favor of the plaintiff in the amount of $200,000, plus costs and pre-judgment interest from the date of the insured's death.
 
 I.
 
 2
 In July, 1984, Abraham Diamond, along with other members of his family, was solicited by Metropolitan's full-time sales representative, Lawrence Caplan. Diamond had, at that time, two whole life insurance policies on his life (each with coverage of $50,000) issued by Metropolitan. Caplan proposed that Diamond trade in ("roll-over") his old policies and purchase a new policy of universal life insurance (one policy with coverage of $200,000) from Metropolitan. For approximately the same total premium, Diamond could obtain double his previous coverage and could also build up a higher cash value in the new policy much more quickly than in the old policies. The roll-over method also avoided adverse tax consequences of cashing in old insurance policies.
 
 
 3
 On July 30, 1984, Diamond met with Caplan and completed Metropolitan's application for a universal life insurance policy in the amount of $200,000. Caplan told Diamond that he could surrender his old Metropolitan policies and have their cash value applied to the premium on the new policy. Indeed, according to Caplan's testimony, he told Diamond that "there would be enough that would be rolled over [from the existing policies] that we can have the policy issued without you paying anything right now...." The cash value of the old policies was approximately $10,000. The annual premium for the new universal policy was $1,700. Diamond signed forms authorizing Metropolitan to cash surrender his old policies and directing Metropolitan to place the cash surrender proceeds into the new policy. While the application signed by Diamond stated that "Receipt of $0 is acknowledged in connection with an application made on this date ...,"[2] it also stated that "Amount paid with Application: $ollover."i"
 
 
 4
 Caplan testified that, at the time the application for the universal life policy was made, he gave Abraham Diamond a document entitled "Receipt and Temporary Insurance Agreement." The actual Agreement has never been produced and is not in evidence. The document apparently has been lost. The content of the document, however, can be ascertained from the similar Agreement given by Caplan to Marvin Diamond, the deceased's brother.[3] The Agreement that was given to Marvin Diamond stated that Metropolitan would grant temporary insurance from the date of application or from the date of a medical examination, if required, provided that, inter alia, "an amount equal to one [twelfth of the annual premium] is received on the date of the application...."
 
 
 5
 On August 2, 1984, Diamond submitted to the required medical examination. The examination revealed nothing negative for insurance purposes. Late in August, Diamond began to feel ill. On or about September 25, 1984, Diamond underwent a liver biopsy and cancer was diagnosed. The universal life policy was not issued until October 25, 1984, but was never delivered to Diamond. Diamond died as a result of liver cancer on February 4, 1985.
 
 II.
 
 6
 There are two insurance documents at issue in this case. The first document is the application signed by Diamond for the universal life policy. The relevant provision states that:
 
 
 7
 Except as set forth in the Receipt and Temporary Insurance Agreement, Metropolitan will have no liability until a policy is delivered personally to the owner and the full first premium due is paid. The policy will then be in effect as of its date of issue. But it will not be in effect unless at the time it is delivered: the condition of health of each person to be insured, and the Applicant if the Applicant's Waiver of Premiums Benefit is applied for, is the same as given in the application.
 
 
 8
 The second document is the Metropolitan's Receipt and Temporary Insurance Agreement ("Temporary Insurance Agreement"). It states in relevant part as follows:
 
 
 9
 Eligibility for Temporary Insurance--Metropolitan will grant Temporary Insurance to each person to be insured if an amount equal to one C-O-M premium is received on the date of the application and there is not material misrepresentation in the application. If we do not receive the full amount of any check, draft or money order, it will not constitute payment....
 
 
 10
 When Temporary Insurance Starts--Coverage starts on the date of this Receipt. But if a medical examination of a person to be insured is initially required by our underwriting rules, coverage will not start until completion of the examination.
 
 
 11
 * * *
 
 
 12
 * * *
 
 
 13
 Temporary Insurance Against Material Changes in Health--If the health of a person to be insured changes while Temporary Insurance is in effect, Metropolitan will consider that person's health as of the date Temporary Insurance began in deciding whether to issue the policy applied for....
 
 
 14
 * * *
 
 
 15
 * * *
 
 
 16
 When Temporary Insurance Ends--Temporary Insurance on any person will end on the earliest of the following:
 
 
 17
 1. When coverage starts under a Metropolitan policy.
 
 
 18
 * * *
 
 
 19
 * * *
 
 
 20
 6. Sixty days from the date of this Receipt.
 
 
 21
 On appeal, the pivotal issue is whether Metropolitan's temporary insurance ever went into effect and, if so, whether any material changes in the decedent's health while the temporary insurance was in effect would preclude Metropolitan from denying coverage under the universal life policy. Metropolitan argues that no proceeds were payable because Diamond never furnished consideration for any agreement by Metropolitan to provide temporary insurance and because any temporary insurance provided under the agreement ended before the universal life policy was issued.
 
 
 22
 According to the relevant provision of the temporary insurance contract, in order for the temporary insurance to go into effect, an applicant must make a premium payment equal to one-twelfth of the annual fee on the date of the application. While no cash exchanged hands on the day that Abraham Diamond applied for a new policy, the surrender of the old policies did constitute the required prepayment of the premium due. See Wilkerson v. Metropolitan Life Ins. Co., 206 N.C. 882, 887-88 175 S.E. 172, 174-75 (1934) (the authorization by the insured at the time of the application to extract the cash value in the lapsed policy to prepay the premium for the new policy was an immediate consideration for the issuance of temporary insurance); see also Jones v. John Hancock Mut. Life Ins. Co., 289 F.Supp. 930, 938 (W.D.Mich.1968), aff'd, 416 F.2d 829 (6th Cir.1969) (advance payment may mean any reasonable equivalent, such as a check, money order or cognovit note).
 
 
 23
 Metropolitan's argument that only cash, check, draft or money order could be accepted as payment is not persuasive. The Temporary Insurance Agreement states that "[i]f we do not receive the full amount of any check, draft or money order, it will not constitute payment." It does not even mention "cash" as a proper form of payment. Therefore, the words "check, draft or money order" are merely words of description and not of limitation.[4] A reasonable person would not read that phrase to preclude payment by a roll-over method. As the district court found, it is undisputed that the cash surrender value of Diamond's old policies well exceeded the required amount and that Metropolitan had such sum in hand[5] when Diamond submitted the application. Moreover, Caplan himself told Diamond that he could either pay by check or he could in the alternative have the cash value of the old policies applied as payment of the premium due on the new policy. The uncontroverted testimony was that Caplan had given Diamond a completed copy of the Receipt and Temporary Insurance Agreement. By doing so, Caplan, as an agent of Metropolitan, was acknowledging the receipt of the prepayment of the premium. Regardless of whether Metropolitan was legally required immediately to cash surrender the old policies to fund the temporary insurance coverage, the surrender cash value did constitute the required prepayment.
 
 
 24
 Metropolitan argues in the alternative that, even if the temporary insurance had gone into effect, it had expired after 60 days and before the coverage started under the universal life policy. The application signed by Diamond stated that a medical examination was required. The medical examination was completed on August 2, 1984. Therefore, the temporary insurance ended sixty days later, on October 2, 1984. Metropolitan contends, therefore, that when it issued the universal life policy on October 25, 1984 it was not obligated to consider Diamond's health as of the date the temporary insurance began. Because Diamond's health changed before the policy was delivered, Metropolitan argues that it has no obligation to make payments pursuant to the universal life policy.
 
 
 25
 Metropolitan's argument, however, is not supported by the plain language in its own standardized Temporary Insurance Agreement. The Agreement clearly stated that it insures against material changes in health:
 
 
 26
 If the health of a person to be insured changes while Temporary Insurance is in effect, Metropolitan will consider that person's health as of the date Temporary Insurance began in deciding whether to issue the policy applied for.
 
 
 27
 (Emphasis added). It is not disputed that Diamond's health materially changed while the temporary insurance was in effect. According to the language drafted by Metropolitan itself, Metropolitan was obligated to consider Diamond's health as of the date temporary insurance began in determining whether or not to issue the universal life policy. As of that time Diamond's health was examined and the examination revealed nothing negative for insurance purposes. We, therefore, reject Metropolitan's contention that it was not under any duty to make payments pursuant to the universal life policy.
 
 For the reasons stated above, we
 
 28
 AFFIRM.
 
 
 
 [1]
 It is not disputed that Maryland law controls
 
 
 [2]
 Caplan testified that he inserted the number "0" because no cash had been received
 
 
 [3]
 In comparing documents given to Abraham and Marvin Diamond, Caplan testified that "Only thing different is the date, his policy numbers and Abe Diamond's name there. Same receipt of zero money was acknowledged on them."
 
 
 [4]
 While this holding may be against Metropolitan's internal procedure, courts have held that insurance companies may not rely on internal procedures of their own to defeat an insured's objectively reasonable expectations. See Jones v. John Hancock Mut. Life Ins. Co., 289 F.Supp. 930, 937-38 (W.D.Mich.1968), aff'd, 416 F.2d 829 (6th Cir.1969)
 
 
 [5]
 The old policies were also issued by Metropolitan. Testimony was introduced that transferring the cash value between different policies would simply be a matter of bookkeeping